**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| BURNSCRAFT MANUFACTURING CORPORATION, d/b/a National Rent-A-Fence Company, | § § § § | |
| Plaintiff, | § § | |
| VS. | § § | CIVIL ACTION NO. H-13-2769 |
| NATIONAL CONSTRUCTION RENTALS, INC., *et al.*, | § § § | |
| Defendants. | § § | |

**MEMORANDUM AND ORDER**

This is a trademark dispute.  The plaintiff, Burnscraft Manufacturing Corp. d/b/a National Rent-a-Fence Co. ("National"), filed an amended complaint against National Construction Rentals, Inc. ("NCR"), seeking cancellation of two of NCR's federal trademark registrations, one for a word mark for "NATIONAL RENT-A-FENCE" and one for a related design mark.  Cancellation under 15 U.S.C. § 1119 requires pleading and proof that when the applicant sought registration, it knew that another party had superior rights in a mark but represented to the Trademark Office that to the "best of [its] knowledge and belief," no other entity had the right to use the mark in commerce.  *See* 15 U.S.C. § 1051(a)(3).  NCR moves to dismiss the amended complaint on the basis that the factual allegations are insufficient to support an inference that its predecessor's applications for marks were fraudulent.  (Docket Entry No. 27).  National responds by arguing that, as amended, the complaint is sufficient to support the cancellation claim.

Based on the amended complaint; the motion, response, and reply; and the applicable law, this court denies the motion to dismiss.  The reasons are explained below.

## I.      Background

This trademark action arises under the Lanham Act. 15 U.S.C. § 1051 *et seq*.  The allegations are taken from National's first amended complaint.  (Docket Entry No. 25).  National alleges that it has been in business since approximately 1971, renting and selling construction equipment, including removable fences for use by construction companies and individuals.  National has operated under the assumed name "National Rent-A-Fence Company" since 1978.  It alleges that its use of the mark "NATIONAL RENT-A-FENCE COMPANY" since 1978 has made the mark distinctive, the basis of extensive good will, and "well known and recognized by consumers and the trade as identifying National Fence's services."  (First Amended Complaint, Docket Entry No. 25 at ¶ 12).  National alleges that its use of the mark began long before NCR first used any similar marks.  (*Id.* at ¶ 11).

National alleges that when NCR's predecessor, National Business Group ("NBG"), applied for a word mark for "National Rent-a-Fence" on July 25, 1995, for uses that included rentals of fencing-related equipment, the application included fraudulent misrepresentations.   The fraud allegations are as follows:

> 15.      Along with the filing of its application for the Purported Mark, and on July 18, 1995, Jim Mooneyham, ("Mooneyham"), the Vice President of NBG, signed a declaration stating that NBG is:
>
>> the owner of the mark sought to be registered; *to the best of his knowledge and belief, no other person, firm, corporation, or association has the right to use said mark in commerce, either in the identical form or in such near resemblance thereto as may be likely, when applied to the goods or services of such other person, to cause confusion, or to cause mistake, or to deceive*; that all statements made herein of his own knowledge are true and that all statements made on information and belief are believed to be true; and

further, that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of the Title 18 of the United States Code and that such willful false statements may jeopardize the validity of the application or document or any registration resulting therefrom.

(Docket Entry No. 25 at ¶¶ 14–15) (emphasis in the complaint).  The word mark registration issued on August 11, 1998.  (*Id.* at ¶ 17 (citing Reg. No. 2,179,805)).

The allegations with respect to the design mark are as follows:

18.  NCR and its predecessor NBG, were aware of National Fence for a number of years.  In fact, in late 1999, Jim Burns president of National Fence, and Mooneyham, vice president of NBG, engaged in discussions regarding NBG's prospective purchase of the business of National Fence.

19.  On September 22, 1999, Jim Burns, president of National Fence, sent a letter of offering to Mooneyham (the "Offer Letter") regarding the sale of the business of National Fence.  The Offer Letter summarized the terms of the sale and stated as follows: "This letter summarized my offer to sell the business of Burnscraft Manufacturing Corp., (BMC) d/b/a National Fence Company and National Rent-A-Fence Company, through the disposition of all of the issued and outstanding shares of stock of BMC, which are now held by me."

20.  NBG never responded to National Fence's Offer Letter.

21.  Upon information and belief, and at some point between 1998 and 2001, NBG merged into NCR with Mooneyham becoming an officer of NCR as well.

22.  In 2001, Mooneyham and two additional representatives of NCR met with Burns at the offices of National Fence to again discuss a purchase of the business of National Fence.

23.  On September 22, 2001, Mooneyham called National Fence requesting information regarding the sales of National Fence for the possible purchase of National Fence.

3

24. On October 24, 2001, Mooneyham sent a fax transmittal sheet to Burns at National Fence providing Burns with NCR's mailing address.

25. In November of 2001 another offer letter was generated and sent to Mooneyham ("Second Offer Letter").

26. Mooneyham and NCR never responded to the Second Offer Letter.

27. Notwithstanding walking into National Fence's offices only a year earlier, on March 7, 2002, NCR nonetheless applied for the NATIONAL RENT A FENCE logo . . . (hereinafter, the "Purported Design").

28. The Purported Design is allegedly used in connection with a variety of services including the custom installation and rental of fencing related equipment.

29. NCR claimed a date of first use of the Purported Design in commerce of June, 1998. Along with the filing of its application for the Purported Mark, Mooneyham, as a representative of NCR, signed a declaration that stated that NCR is

> the owner of the service mark sought to be registered, or, if the application is being filed under 15 U.S.C. § 1051 (b), he/she believes applicant to be entitled to use such mark in commerce; to the best of his/her knowledge and belief *no other person, firm, corporation, or association has the right to use the mark in commerce, either in the identical form thereof or in such near resemblance thereto as to be likely, when used on or in connection with the services of such other person, to cause confusion, or to cause mistake, or to deceive* and that all statements made of his/her own knowledge are true; and that all statements made on information and belief are believed to be true.

30. Upon information and belief, NCR was aware of National Fence's use and ownership of the NATIONAL RENT-A-FENCE mark at the time the above declaration was signed, and knowingly went forward while concealing this information.

31.     On October 31, 2002, NBG assigned all right, title and interest in and
         to the Purported Mark to NCR.

(*Id.* at ¶¶ 18–31) (emphasis in the complaint).  The design mark registration issued on May 4, 2004.

In the amended complaint, National alleges that NCR's use of the challenged "NATIONAL RENT-A-FENCE" word and design marks are infringing.  National also alleges that although it fears that NCR will sue it for infringement, such a suit would be baseless because NCR committed fraud on the PTO when it "intentionally failed to reveal" National's prior and superior use of the mark. (*Id*. at ¶ 50).  National seeks a declaratory judgment that its use of the "NATIONAL RENT-A-FENCE COMPANY" word mark does not infringe NCR's marks and does not violate the Lanham Act.

The claim at issue in this motion to dismiss seeks cancellation of NCR's registered marks on the basis that:

> [u]pon information and belief, NCR committed fraud on the PTO when it signed a declaration under oath in connection with its trademark applications for the Purported Mark and the Purported Design that there was "no other person, firm, corporation, or association has the right to use the mark in commerce" despite knowing that National Fence was currently using and continued to use the . . . Mark.

(*Id*. at ¶ 73).

NCR has moved to dismiss the cancellation claim.  (Docket Entry No. 27).  Both parties' arguments are analyzed below.

## II.    The Legal Standard for a Motion to Dismiss

Federal Rule of Civil Procedure 8(a)(2) requires "a short and plain statement of the claim showing that the plaintiff is entitled to relief . . . [to] give the defendant fair notice of what the . . . claim is and the grounds upon which it rests."  *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544,

555 (2007).  A court may dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) when it does not contain enough facts to state a claim to relief that is plausible on its face.  *See id.* at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.  Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (citations and parentheticals omitted).  In considering a motion to dismiss, a court must accept all of the plaintiff's allegations as true and construe them in the light most favorable to the plaintiff.

Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." FED. R. CIV. P. 9(b); *see Leatherman v. Tarrant Cty. Narcotics Intelligence Unit*, 507 U.S. 163, 168 (1993); *Lone Star Ladies Inv. Club v. Schlotzsky's Inc.*, 238 F.3d 363, 368 (5th Cir. 2001).

## III.    Analysis

### A.    A Lanham Act Cancellation Claim

A trademark can be cancelled under 15 U.S.C. § 1064(3) if its "registration was obtained fraudulently."  To seek cancellation, a plaintiff must prove (1) a false representation, (2) regarding

a material fact, (3) the registrant's knowledge or belief that the representation is false, (4) the intent to induce reliance on the misrepresentation, (5) reasonable reliance, and (6) damages proximately resulting from the reliance. *Robi v. Five Platters, Inc.*, 918 F.2d 1439, 1444 (9th Cir. 1990). "Fraud in procuring a trademark occurs when an applicant knowingly makes false, material representations of fact in connection with his application." *In re Bose Corp.*, 580 F.3d 1240, 1243 (Fed. Cir. 2009). A plaintiff bears a "heavy" burden to prove fraud. *Robi*, 918 F.2d at 1439; *Dallas Cowboys Football Club, Ltd. v. Am.'s Team Props., Inc.*, 616 F. Supp. 2d 622, 644 (N.D. Tex. 2009) ("The moving party bears a heavy burden in proving fraud in the procurement of a registration."). The plaintiff must identify a deliberate attempt by the registrant to mislead the PTO. "Merely making a false statement is not sufficient to cancel a mark." *L.D. Kichler Co. v. Davoil Inc.*, 192 F.3d 1349, 1351 (Fed. Cir. 1999). An error or inadvertent misstatement is insufficient to establish fraud. *Id.* "Because the trademark application oath is phrased in terms of a subjective belief, it is extremely difficult to prove fraud so long as the signer has an honestly held, good faith belief that it is the senior right holder. *Hana Fin., Inc. v. Hana Bank*, 500 F. Supp. 2d 1228, 1235 (C.D. Cal. 2007) (internal quotations omitted).

Rule 9(b) requires more than conclusory allegations that the defendant "knew" about a plaintiff's superior rights. But scienter allegations may be less specific than allegations of the "circumstances constituting fraud," because "malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." FED. R. CIV. P. 9(b). Nothing in the Federal Rules of Civil Procedure, however, relieves a plaintiff of the obligation to "set forth facts from which an inference of scienter could be drawn." *Cooper v. Pickett*, 137 F.3d 616, 628 (9th Cir. 1997) (quoting *In re GlenFed, Inc., Sec. Litig.*, 42 F.3d 1541, 1546 (9th Cir. 1994) (en banc)).

7

A plaintiff alleging a fraudulent statement in a trademark application must plead particular facts, which, if proven, would establish that, as of the application filing date, the defendants believed that the plaintiff had superior or clearly established rights and that a likelihood of confusion would result from the applicant's use of the marks. Alternatively, the plaintiff must plead particular facts (such as substantial identify between the parties' marks and good or services), which, if proven, would establish that, when the application was filed, the defendant had no reasonable basis for its averred belief that no other person had the right to use the same or a confusingly similar mark on or in connection with the goods or services identified in the application. *See Intellimedia Sports Inc., v. Intellimedia Corp.*, 43 U.S.P.Q.2d 1203, 1997 WL 398344, *4 (T.T.A.B. 1997).

### B.      The Allegations of NCR's Knowledge of National's Use of Ownership of the Mark

It is clear that National has sufficiently pleaded the who, what, when, and how of the alleged misrepresentations. The issue is whether it has sufficiently pleaded facts that give rise to an inference that NCR's predecessor knew of National's prior use and ownership when it filed the word mark application in 1995 and the design mark application in 2002. The trademark application oath requires the applicant to verify that he or she "believes that he or she . . . [is] the owner of the mark sought to be registered." 15 U.S.C. § 1051(a). NCR's duty to disclose depends on whether it knew of National's superior rights to the mark when it filed the trademark applications. *See Blue Bell, Inc. v. Farah Mfr. Co., Inc.*, 508 F.2d 1260, 1265 (5th Cir. 1975) ("The exclusive right to a trademark belongs to one who first uses it in connection with specified goods.").

On a motion to dismiss, the court must accept as true the plaintiff's sufficiently pleaded factual allegations and draw all reasonable inferences in the plaintiff's favor. Applying this standard,

the allegations in National's amended complaint are sufficient to support an inference of fraud in both applications.

First, National has sufficiently alleged facts showing its prior long and continuous use of the NATIONAL RENT-A-FENCE COMPANY mark. Second, National has sufficiently alleged superior rights in the NATIONAL RENT-A-FENCE COMPANY mark based on its prior continuous use of the mark in commerce. Third, National has sufficiently alleged that before NCR applied for the word mark, and even more clearly before it applied for the design mark, NCR was aware of National's long-standing and consistent use of the NATIONAL RENT-A-FENCE COMPANY mark.

National has alleged that NCR and its predecessor had long been aware of National Fence, its business, its name, and its use and ownership of the NATIONAL RENT-A-FENCE COMPANY mark to designate its products. Alleging the obvious, National points out that its business was named the "National Rent-a-Fence Company." National also alleges that before 1995, NCR's predecessor and National were offering closely related fencing services and were promoting them through the same channels of trade. This supports the inference that before filing the word mark application, NCR knew of National's long-standing and consistent use of the NATIONAL RENT-A-FENCE COMPANY mark.

National also alleges that before NCR filed the design mark application, NCR's vice-president had "multiple discussions and meetings" with National about a possible purchase of National's business. (Docket Entry No. 29 at 6). The parties exchanged financial information and other documents relating to National's business and assets. National's amended complaint has alleged sufficient facts, that if proven, would support an inference that when NCR filed the trademark

applications, it knew of National's superior rights to the NATIONAL RENT-A-FENCE COMPANY mark and that a likelihood of confusion would result from NCR's use of similar marks.

This result is consistent with that reached by other district courts facing similar issues. *See, e.g.*, *Prof'l Choice Sports Medicine Prods., Inc. v. Eurow & O'Reilly Corp.*, No. 13-cv-1484, 2014 WL 524007, at *6–7 (S.D. Cal. Feb. 20, 2014); *Cimarron Lumber and Supply Co. v. McLiney Lumber and Supply, LLC*, No. 12-2240, 2013 WL 1308708, at *4–5 (D. Kan. Mar. 29, 2013).

**IV.   Conclusion**

NCR's motion to dismiss, (Docket Entry No. 27), is denied.

SIGNED on April 9, 2014, at Houston, Texas.

Lee H. Rosenthal
United States District Judge

10